1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| BOB BEJARANO, | ) | Case No.: 1:11-cv-00016-DAD-SAB (PC) |
| Plaintiff, | ) ) | |
| v. | ) ) | FINDINGS AND RECOMMENDATIONS RECOMMENDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT BE GRANTED |
| KATHLEEN ALLISON, et al., | ) ) | |
| Defendants. | ) ) | [ECF No. 71.] |
| | ) ) | |

Plaintiff Bob Bejarano is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Plaintiff declined United States magistrate judge jurisdiction on January 27, 2011; therefore, this matter was referred to the undersigned pursuant to 28 U.S.C. § 636(1)(B) and Local Rule 302.  Defendants have not consented or declined United States magistrate judge jurisdiction.

Currently before the Court is Defendants' motion for summary judgment, filed October 14, 2015.

**I.**

**RELEVANT HISTORY**

This action is proceeding on Plaintiff's first amended complaint, filed May 31, 2011, against Defendants Allison, Goss, Hernandez, and Perez for subjecting Plaintiff to conditions of confinement, namely the denial of outdoor exercise in violation of the Eighth Amendment.

1

1    After the denial of Defendants' motion to dismiss the complaint, Defendants filed an answer to

2    the complaint on October 31, 2014.  (ECF Nos. 53 & 55.)

3        On October 14, 2015, Defendants filed the instant motion for summary judgment.  (ECF No.

4    71.)  After Plaintiff received an extension of time, he filed an opposition to Defendants' motion on

5    December 11, 2015.  (ECF No. 75.)  Defendants filed a reply on January 12, 2016.  (ECF No. 78.)

6    Pursuant to Local Rule 230(*l*), the motion is deemed submitted for review without oral argument.

## II.

## LEGAL STANDARD

9        Any party may move for summary judgment, and the Court shall grant summary judgment if

10   the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

11   judgment as a matter of law.  Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mut. Inc. v.

12   U.S., 636 F.3d 1207, 1216 (9th Cir. 2011).  Each party's position, whether it be that a fact is disputed

13   or undisputed, must be supported by (1) citing to particular parts of materials in the record, including

14   but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials

15   cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot

16   produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1) (quotation marks omitted).

17   The Court may consider other materials in the record not cited to by the parties, but it is not required

18   to do so.  Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031

19   (9th Cir. 2001); accord Simmons v. Navajo Cnty., Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

20       In judging the evidence at the summary judgment stage, the Court does not make credibility

21   determinations or weigh conflicting evidence, Soremekun, 509 F.3d at 984 (quotation marks and

22   citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party

23   and determine whether a genuine issue of material fact precludes entry of judgment, Comite de

24   Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation

25   marks and citation omitted).

26   ///

27   ///

28   ///

# III.

# DISCUSSION

## A.    Summary of Plaintiff's First Amended Complaint

Plaintiff's First Amended Complaint alleges fact related to his conditions and confinement from approximately June 21, 2009 until April 22, 2010.  On June 21, 2009, Facility C was placed on lockdown for a group disturbance between southern and northern Hispanics.  From July 12, 2009 until July 18, 2009, prison officials completed a search of the facility and conducted interviews.  Shortly thereafter, southern Hispanic inmates were subjected to a modified program that deprived inmates of out-of-cell exercise, pending further investigation.  The modified program without out-of-cell exercise continued for eleven months.  During the lockdown, Plaintiff was confined in his cell seven days a week except for a five minute shower every other day except Sundays.  Plaintiff alleges that Defendants Allison and Hernandez were directly responsible for the lockdown of Facility C that denied Plaintiff out-of-cell exercise.  As a result of the lockdown, Plaintiff suffered from muscle cramps, stress, migraine headaches, constipation, stomach aches, heart burn, and thoughts of suicide.

On March 1, 2009, Plaintiff submitted an appeal requesting access to the mini-concrete yards for out-of-cell exercise.  On or about March 11, 2010, Defendant Perez denied Plaintiff's appeal.  On or about March 20, 2010, Defendants Goss and Hernandez denied Plaintiff's second appeal.  The appeal denial informed Plaintiff that Facility C did not have enough staff to monitor a group of inmates in the mini-concrete yards.  The lockdown period ended on April 22, 2010.

## B.    Statement of Undisputed Facts

1.    Plaintiff Bob Bejarano (Plaintiff) is a prisoner in the custody of the California Department of Corrections and Rehabilitation (CDCR).  (First Am. Compl., ECF. No. 9.)

2.    Plaintiff alleges that Defendants were deliberately indifferent to his health by denying him outdoor exercise during a modified program that lasted approximately ten months at the California Substance Abuse Treatment Facility and Prison (SATF) in Corcoran, California, from June 22, 2009, to April 22, 2010.  (Id. at pp. 4-7.)

3.      Facility C at SATF was placed on a "modified program" on June 22, 2009, because of a group disturbance that occurred between the Southern Hispanic and Northern Hispanic inmate population on June 21, 2009, at approximately 12:08 p.m.  (Allison Decl. ¶ 2; Hernandez Decl. ¶ 2; Goss Decl. ¶ 2; Perez Decl. ¶ 2.)

4.      A modified program is colloquially referred to as a "lockdown," while the "group disturbance" could be described in layman's terms as an "inmate riot."  (Id.)

5.      Facility C at SATF was a Level IV general population unit that housed over 650 inmates during the period in question, June, 2009, through April, 2010.[1]  (Id. at ¶ 3.)

6.      These inmates typically have a history of violent and assaultive behavior and numerous convictions for rule violations within CDCR.[2]  (Id.)

7.      Many of the Facility C inmates were incarcerated for gang-related convictions or convictions under California's three-strikes law, and have prison sentences of life terms without parole or determinate sentences of fifty years or more.  (Id.)

8.      Such inmates require an extremely higher level of security because they are a greater security threat than most other general population inmates.  (Id.)

9.      Inmates often disrupt the safety and security of a facility such as Facility C by engaging in violent acts.  (Id. at ¶ 4.)

10.     If an incident is a result of unrest among significant numbers of inmates or different groups of inmates, the warden may implement a lockdown or modified program under California Code of Regulations, title 15, section 3000.  (Id.)

---

[1] Plaintiff attempts to dispute this fact by stating that Facility C at SATF is still a Level IV general population unit. Plaintiff's statement is indeed consistent with the statement of fact as presented by Defendants, and Plaintiff fails to raise a dispute as to the additional information provided by Defendants.

[2] Plaintiff's lack of knowledge and/or information to dispute a particular statement of fact presented by Defendants, is not sufficient to create a dispute over such fact.  Instead, the opposing party must provide must offer admissible evidence that creates a genuine issue of dispute of fact, and Plaintiff's objection on such grounds are overruled.

11. During a modified program, the affected inmates' access to outdoor exercise, visiting, quarterly packages, and canteen may be limited or suspended until prison staff and administration can be reasonably certain that the violent acts will not continue. (Id.)

12. A modified program can cover all of the facility's inmates, or may apply to only certain groups of inmates. (Id. at ¶ 5.)

13. These "programming changes" are designed to protect inmates, staff, and the prison while officials investigate and attempt to determine how the inmates' customary privileges can be restored. (Id.)

14. The modified program remains in effect until all searches, investigations, and interviews conducted in the aftermath of the disruptive incident are completed, and prison staff and administration determine that a return to normal programming can be safely achieved. (Id.)

15. The objective of the modified program is to restore inmate privileges as soon as it is reasonably safe to do so. (Id. at ¶ 6.)

16. In all instances, modified programs remain in place only as long as necessary to ensure the safety of the inmates and prison staff. (Id.)

17. Modified programs are never meant to be punitive or otherwise implemented in bad faith. (Id.)

18. During the modified program in question, and during modified programs in general at SATF, prison officials and administration met regularly with Defendant Allison to assess Facility C's conditions and determine whether the inmates could be safely returned to normal programing. (Id. at ¶ 7.)

19. The SATF administration met to discuss the progress of the investigation, the status of the modified program, any further incidents of violence, and the development of a plan to resume normal programming. (Id.)

20. Defendant Allison met with the Chief Deputy Warden, the Associate Warden, and the Captain of Facility C during these meetings. (Id. at ¶ 8.)

21.     The Facility Captain and Associate Warden reported information solicited from staff regarding inmates on Facility C.  (Id.)

22.     The Facility Captain and Associate Warden could also make recommendations for changes in programming based on relevant intelligence and information collected during the course of the investigation.  (Id.)

23.     The Facility Captain, Lieutenant Correctional Officers, and Associate Warden do not have any decision-making authority to make adjustments to or terminate the modified program.  (Id.)

24.     That authority rested solely with Defendant Allison as the Warden of SATF.  (Id.)

25.     During a modified program, the Facility Captain prepares a "program status report" detailing the implementation of the modified program, including the status of suspended privileges, searches and interviews, and the release process.  (Id. at ¶ 9.)

26.     Program status reports also explain to the inmates how basic needs will be met during the modified program, such as medical care, feeding, showers, etc.  (Id.)

27.     Program status reports must be approved by the Warden and remain in effect until a new report is issued.  (Id.)

28.     The Facility Captain, Lieutenant, Correctional Officers, and Associate Warden never have authority to deviate from the restrictions imposed in the program-status-report matrix.  (Id. at ¶ 10.)

29.     During a modified program that restricted access to the recreation yard, the Facility Captain, Lieutenant, Correctional Officers, and Associate Warden could not restore outdoor exercise for general population inmates without authorization from the Warden.  (Id.)

30.     Defendants were familiar with the program-status reports used to implement and record information about the modified program implemented at SATF.  (Id. at ¶ 11.)

31.     Program-status reports are prepared at or near the time of the acts, events, decisions, and conditions that they record.  (Id. at ¶ 11.)

32. Program-status reports are prepared by someone with knowledge of the information recorded in the program-status reports, or they are prepared from information transmitted by someone with knowledge of the information recorded in the program-status reports.  (Id. at ¶ 11.)

33. SATF maintained program-status reports in the regular course of business for this modified program, and the preparation of program-status reports is a regular practice associated with the implementation of modified programs.  (Id. at ¶ 11.)

34. A violent group disturbance occurred on Facility C at SATF on June 21, 2009, between the Southern Hispanic and Northern Hispanic inmate population.  (Id. at ¶ 12.)

35. It is well known within CDCR that Southern Hispanic inmates and Northern Hispanic inmates harbor tremendous enmity for each other, and violent incidents between the two groups are not uncommon within CDCR prisons.  (Id.)

36. The June 21, 2009 group disturbance occurred simultaneously on Facility C Yards 1 and 2, and in the dayrooms in Housing Units C4, C6, and C8.  (Id. at ¶ 13.)

37. The simultaneous incidents occurring in multiple locations of the facility showed that this disturbance was a long-planned and coordinated attack of a serious nature.  (Id.)

38. As a result of the incident, Defendant Allison authorized Facility C to be placed on a modified program to ensure the safety and security of the prison, the Facility, the inmates, the prison staff, and the community, until this incident could be investigated and it could be determined that another such incident would not occur if Facility C was returned to normal programing.  (Id.)

39. This incident was assigned log number SATF-03-09-05-0235.  (Id.)

40. A prison riot previously occurred on Facility C between Black and White inmates on July 25, 2008.  (Id. at ¶ 14.)

41. This incident resulted in a modified program and was assigned log number SATF-03-08-07-0293.  (Id.)

42. In light of the June 21, 2009, disturbance, and because of continuing concerns over inmate, staff, and Facility safety, the modified program with log number SATF-08-09-

7

05-0235 superseded the modified program implemented for incident number SATF-03-08-07-0293.  (Id.)

43. A total of seventy-five inmates were involved in the June 21, 2009 disturbance. (Id. at ¶ 15.)

44. Three Black inmates were also identified as being involved in the incident and eleven Northern Hispanic inmates were treated at outside hospitals for injuries sustained during the melee.  (Id.)

45. The entire inmate population on Facility C was initially placed on modified program pending a facility-wide search and investigation.  (Id.)

46. Searches were conducted in all eight housing units, the program support areas, four dining halls, and two yards.  (Id.)

47. On June 30, 2009, another violent incident occurred on Facility C when a Southern Hispanic inmate assaulted a Black inmate during an escort to the medical clinic on the upper yard of Facility C.  (Id. at ¶ 16.)

48. This incident was assigned log number SATF-03-09-06-0252.  (Id.)

49. On July 8, 2009, the administration met to discuss this modified program.  (Id. at ¶ 17.)

50. It was decided to keep the entire Facility C inmate population on modified program pending the completion of inmate interviews, searches of the facility, and further intelligence gathering.  (Id.)

51. As of July 9, 2009, prison staff completed three hundred and fourteen inmate interviews among the different races of inmates.  (Id.)

52. The Investigative Services Unit (ISU) and the Institutional Gang Investigators (IGI) worked to obtain information from other institutions that could assist in the investigation, and to monitor the prison mail as well.  (Id.)

53. On July 16, 2009, the administration met to discuss this modified program.  (Id. at ¶ 18.)

54. It was decided to keep the entire Facility C inmate population on the modified program pending the completion of inmate interviews, searches of the facility, and further intelligence gathering.  (Id.)

55. The administration met again on August 3, 2009, to discuss this modified program.  (Id. at ¶ 19.)

56. It was decided to place inmates categorized as "Others" on a normal program with the exception of no dayroom activities.  (Id.)

57. The remaining inmate population on Facility C was kept on the modified program. (Id.)

58. Black, White, and Hispanic inmates were allowed to receive their quarterly packages while in waist restraints.  (Id.)

59. "Others" are typically inmates who are not Black, White, or Hispanic.  (Id.)

60. The administration met again on August 7, 2009, to discuss this modified program.  (Id. at ¶ 20.)

61. It was decided to place inmates categorized as "Others" on a normal program with the exception of no dayroom activities.  (Id.)

62. The remaining inmate population on Facility C was kept on the modified program. (Id.)

63. Black, White, and Hispanic inmates were allowed to receive canteen while escorted in waist restraints.  (Id.)

64. On August 18, 2009, a Northern Hispanic inmate attacked two Southern Hispanic inmates in the Facility C medical clinic holding cell.  (Id. at ¶ 21.)

65. Three other Southern Hispanic inmates in the holding cell began to assault the Northern Hispanic inmate.  (Id.)

66. All inmates were in restraints behind their backs but the Northern Hispanic inmate had moved his handcuffs to the front of his body.  (Id.)

67. This incident was assigned log number SATF-03-09-08-0317.  (Id.)

68. A meeting was held on August 18 or 19, 2009, to discuss this incident.  (Id.)

69.   It was decided to placer inmates categorized as "Others" on a normal program with the exception of no dayroom activities.  (Id.)

70.   The remaining inmate population on Facility C was kept on the modified program. (Id.)

71.   Black and White inmates could be escorted together, but Northern and Southern Hispanics were to be escorted separately.  (Id.)

72.   The administration met again on August 21, 2009, to discuss this modified program. (Id. at ¶ 22.)

73.   It was decided to conduct further searches of the Facility C housing unit and interviews in light of information obtained about a possible assault on prison staff.  (Id.)

74.   All inmates were placed on the modified program except for "Others" who were critical workers.  (Id.)

75.   Black and White inmates could be escorted together, but Northern and Southern Hispanics were not to be escorted together.  (Id.)

76.   On September 2, 2009, staff discovered metal missing from the light fixtures in cells of Housing Unit C8.  (Id. at ¶ 23.)

77.   Based on experience and training, it was reasonable to conclude that the metal was removed from the light fixtures by the inmates in order to fabricate an inmate manufactured weapon for a planned future assault.  (Id.)

78.   A meeting was held on September 4, 2009, regarding this incident and it was decided that all housing units on Facility C would be searched, and inmate interviews would be conducted regarding the missing metal stock.  (Id.)

79.   The entire inmate population Facility C was placed on the modified program except for "Others" who were critical workers.  (Id.)

80.   The administration met again on September 15, 2009, to discuss this modified program. (Id. at ¶ 24.)

81.   It was decided that all Facility C inmates would remain on the modified program except for "Others" who were critical workers, except for no dayroom activities.  (Id. at ¶ 24.)

82. Black and White inmates could be escorted together, but Northern and Southern Hispanics were not to be escorted together.  (Id.)

83. The administration met again on September 21, 2009, to discuss this modified program. (Id. at ¶ 25.)

84. It was decided that all Facility C inmates would remain on the modified program except for "Others" who were critical workers, except for no dayroom activities.  (Id.)

85. Black and White inmates could be escorted together, but Northern and Southern Hispanics were not to be escorted together.  (Id.)

86. On September 22, 2009, SATF administration participated in a conference call with Acting Associate Director of CDCR, D. Adams, regarding the modified program. (Allison Decl. ¶ 26; Hernandez Decl. ¶ 26; Goss Decl. ¶ 26.)

87. Mr. Adams was informed that Facility C staff conducted interviews with the inmate population, searched the housing units on the Facility, and toured the housing units with the Inmate Advisory Committee Representatives.  (Id.)

88. Mr. Adams was informed that ISU and IGI monitored the mail and phone calls as well as conducted interviews with inmates.  (Id.)

89. Mr. Adams was briefed in detail on the calculated release plan for Black and White inmates on Facility C, and the initial steps of that plan were to release the Black and White Inmate Advisory Committee Representatives unrestrained, but escorted to the housing units to conduct their business.  (Id.)

90. The next step was to allow Black and White program office critical workers to be released for their work assignments unrestrained but escorted, followed by the release of Black and White housing unit porters.  (Id.)

91.  It was determined that Mr. Adams would be briefed on the modified program governing the Hispanic inmates at a later date.  (Id.)

92. The administration met again on October 1, 2009, to discuss this modified program. (Allison Decl. ¶ 27; Hernandez Decl. ¶ 27; Goss Decl. ¶ 27; Perez Decl. ¶ 26.)

93. It was decided that all Facility C inmates would remain on the modified program except for "Others" who were critical workers, except for no dayroom activities.  (Id.)

94. Black and White inmates could be escorted together, but Northern and Southern Hispanics were not to be escorted together.  (Id.)

95. Black and White Inmate Advisory Counsel Representatives were to be escorted and unrestrained.  (Id.)

96. On October 16, 2009, two restrained Northern Hispanic inmates were attacked by two unrestrained Southern Hispanic inmates in Housing Unit C1's dayroom.  (Id. at ¶ 28; Perez Decl. ¶ 27.)

97. This incident was assigned log number SATF-03-09-10-0391.  (Id.)

98. On October 26, 2009, staff discovered metal stock missing from Housing Unit C2. (Allison Decl. ¶ 29; Hernandez Decl. ¶ 29; Goss Decl. ¶ 29; Perez Decl. ¶ 28.)

99. Based on experience and training, it was reasonable to conclude that the metal was removed by the inmates in order to fabricate inmate manufactured weapons for planned future attacks.  (Id.)

100. On November 4, 2009, nine restrained Southern Hispanic inmates assaulted two restrained Northern Hispanic inmates in Housing Unit C8's dayroom while staff were conducting housing unit searches.  (Allison Decl. ¶ 30; Hernandez Decl. ¶ 30; Goss Decl. ¶ 30; Perez Decl. ¶ 29.)

101. The administration determined that the Hispanics inmates would remain on modified program pending completion of ongoing investigation into the current violent activity. (Id.)

102. During the week of November 6, 2009, Facility C staff discovered an inmate manufactured weapon (metal sharpened to a point) secreted in the rectum of a Southern Hispanic inmate.  (Allison Decl. ¶ 31; Hernandez Decl. ¶ 31; Goss Decl. ¶ 31; Perez Decl. ¶ 30.)

103. Another conference call with the Associate Director of CDCR was held on November 16, 2009, to discuss this modified program.  (Allison Decl. ¶ 32; Hernandez Decl. ¶ 32; Goss Decl. ¶ 32.)

104. Defendant Allison and her administration informed the Associate Director that Facility C was conducting the calculated release plan for the Black and White inmate population for July 25, 2008 incident (SATF-03-08-07-0293.)  (Id.)

105. Defendant Allison and her administration also informed the Associate Director that there continued to be ongoing assaultive behavior between the Northern and Southern Hispanic inmates since the June 21, 2009 riot (SATF-03-09-06-0235.)  (Id.)

106. Defendant Allison and her administration informed the Associate Director that once the Black and White inmate calculated-release plan was completed, or the inmate population prevents a successful completion of returning to normal program, the North and South Hispanic calculated release plan would be submitted for review.  (Id.)

107. The plan would mirror the same as the Black and White inmate plan in releasing by stages.  (Id.)

108. It was also possible that the Northern Hispanic inmates would receive normal programming due to the ongoing assaultive incidents initiated by the Southern Hispanic inmate population.  (Id.)

109. During the week of December 6, 2009, there were two separate in-cell assaults between Southern Hispanic inmates involving inmate-manufactured weapons, and there was one incident on the recreation yard involving two Black inmates and a razor.  (Allison Decl. ¶ 33; Hernandez Decl. ¶ 33; Goss Decl. ¶ 33; Perez Decl. ¶ 31.)

110. On February 2, 2010, a Black inmate committed the act of attempted murder on a peace officer on Facility C.  (Allison Decl. ¶ 34; Hernandez Decl. ¶ 34; Goss Decl. ¶ 34; Perez Decl. ¶ 32.)

111. The inmate and the correctional officer previously discussed an issue relating to the inmate's property.  (Id.)

112. The inmate and correctional officer were in the correctional officer's office when the inmate used an inmate manufactured weapon to stab the correctional officer in the back of the head.  (Id.)

113. All inmates were therefore placed on modified program pending the completion of an investigation.  (Id.)

114. This incident was assigned log number SATF-03-10-02-0036.  (Id.)

115. Interviews were conducted with inmates on all of the Facilities regarding the February 2, 2010 incident.  (Allison Decl. ¶ 35; Hernandez Decl. ¶ 35; Goss Decl. ¶ 35; Perez Decl. ¶ 33.)

116. It was determined that the incident was isolated to Facility C.  (Id.)

117. A threat assessment meeting was conducted on March 4, 2010, and it was determined that the Facility C modified program would continue.  (Id.)

118. The Hispanic inmates' non-contact visiting privileges, and access to the canteen and quarterly packages, were reinstated on March 24, 2010.  (Allison Decl. ¶ 36; Hernandez Decl. ¶ 36; Goss Decl. ¶ 36; Perez Decl. ¶ 34.)

119. Another threat assessment meeting was held on March 28, 2010, where it was determined that the February 2, 2010 attack was an isolated incident between the inmate and the correctional officer.  (Allison Decl. ¶ 37; Hernandez Decl. ¶ 37; Goss Decl. ¶ 37; Perez Decl. ¶ 35.)

120. It was decided to return the Black inmate population to normal programming.  (Id.)

121. White and "Other" inmates had previously returned to normal programming on or about March 8, 2010.  (Id.)

122. The Hispanic population remained on the modified program pursuant to the Program Status Report number SATF-03-09-06-0235.  (Id.)

123. The modified program on Facility C was lifted on April 22, 2010, when the investigation concluded and it was determined that the inmate population could be safely returned to normal programming.  (Allison Decl. ¶ 38; Hernandez Decl. ¶ 38; Goss Decl. ¶ 38; Perez Decl. ¶ 36.)

14

124. Prison officials on Facility C were alerted to numerous threats and incidents of violence from June 22, 2009 through February of 2010.  (Allison Decl. ¶ 39; Hernandez Decl. ¶ 39; Goss Decl. ¶ 39; Perez Decl. ¶ 37.)

125. Without assessing the risk, determining what areas of the prison could be affected and conducting an investigation, Facility C staff could not accurately identify which specific Facility C inmates were likely to be involved in the violent incidents and threats of violence.  (Id.)

126. The investigation revealed on going tension between the Northern and Southern Hispanic inmates, and that simply lifting the modified program as to those inmates would have resulted in further violence on Facility C, and would have been inadequate to ensure the safety of all inmates and staff.   (Id.)

127. From the end of June 2009, to April 2010, Facility staff and SATF administration met regularly to assess conditions on Facility C.  (Allison Decl. ¶ 40; Hernandez Decl. ¶ 40; Goss Decl. ¶ 40; Perez Decl. ¶ 38.)

128. Defendant Allison and her administration took careful, gradual, and calculated steps to return the inmates to normal programming.  (Id.)

129. Defendant Allison and her administration also initiated regular and controlled incremental releases of inmates from the modified program when the available intelligence indicated it was safe to restore recreational yard access.  (Id.)

130. The releases were only prolonged when staff learned of additional threats of inmate violence, or actual violent incidents occurred.  (Id.)

131. Recreational yard and dayroom privileges pose the greatest danger to the safety and security of inmates, staff, and the institution because large groups of inmates are able to congregate and interact in these areas.  (Allison Decl. ¶ 41; Hernandez Decl. ¶ 41; Goss Decl. ¶ 41; Perez Decl. ¶ 41.)

132. After serious violent incidents, or serious threats to prison security, access to the recreation yard is typically restricted.  (Id.)

133. Doing so helps prevent further incidents of violence at the facility, and makes it more difficult for inmates to communicate and coordinate attacks both inside and outside of the institution.  (Id.)

134. The frequency, maliciousness, and continued threat of inmate violence among the Hispanic population on Facility C, rather than any alleged deliberate indifference of prison officials, forced SATF staff to restrict the Hispanic inmates' outdoor exercise privileges, and that was done to ensure the safety of staff and inmates as well as the security of the prison.  (Allison Decl. ¶ 42; Hernandez Decl. ¶ 41; Goss Decl. ¶ 41; Perez Decl. ¶ 40.)

135. Plaintiff submitted an inmate appeal regarding the modified program and his lack of outdoor exercise on or about March 1, 2010.  (Allison Decl. ¶ 44; Hernandez Decl. ¶ 42; Goss Decl. ¶ 42; Perez Decl. ¶ 39.)

136. This appeal was assigned log number SATF-10-00900.  (Id.)

137. Defendant Perez reviewed, investigated, and signed the Informal Level Response to this appeal on March 11, 2010, because he was a Correctional Officer where Plaintiff was housed in Unit C2.  (Perez Decl. ¶ 39.)

138. Plaintiff requested that "all Southern Hispanics" be provided with access to the concrete yard during the modified program.  (Hernandez Decl. ¶ 42; Goss Decl. ¶ 42; Perez Decl. ¶ 39.)

139. Defendant Perez denied this appeal because per institution policy, the safety and security of the prison during the modified program took precedent over Plaintiff's request.  (Perez Decl. ¶ 39.)

140. Defendant Goss was the Correctional Lieutenant on Facility C at SATF when Plaintiff submitted his appeal.  (Goss Decl. ¶¶ 1, 42, 43.)

141. Defendant Goss reviewed, investigated, and signed the First Level Response to this appeal on March 20, 2010.  (Hernandez Decl. ¶ 42; Goss Decl. ¶ 42.)

142. Defendant Hernandez, as the Associate Warden, reviewed and signed the First Level Response as well.  (Id.)

143.   Defendant Hernandez began serving as Associate Warden with responsibilities for Facility C at SATF on March 1, 2010.  (Hernandez Decl. ¶ 11.)

144.   Plaintiff requested that "all Southern Hispanics" be provided with access to the concrete yard during the modified program.  (Hernandez Decl. ¶ 42; Goss Decl. ¶ 42; Perez Decl. ¶ 39.)

145.   Plaintiff's inmate appeal was given careful consideration and was thoroughly researched.  (Hernandez Decl. ¶ 43; Goss Decl. ¶ 43.)

146.   The appeal was referred for a First Level Review on March 20, 2010, and Defendant Goss interviewed Plaintiff that day in order to provide him with an opportunity to fully explain the appeal, and to provide any supporting evidence of documents.  (Id.)

147.   Plaintiff alleged that he suffered cruel and unusual punishment due to being on a modified program.  (Id.)

148.   It was determined that Facility C did not have enough staff to monitor a group of inmates at concrete yard and still keep the current program in place.  (Allison Decl. ¶ 47; Hernandez Decl. ¶ 43; Goss Decl. ¶ 43.)

149.   Each modified program requires staff to be utilized for investigate purposes, medical escorts, conducting interviews, writing reports, conducting mass cell inspections, and ensuring all the daily functions of the Facility are conducted.  (Id.)

150.   Staff resources were also required to respond to and handle any incident which may arise.  (Id.)

151.   Plaintiff alleges that he could have been provided outdoor exercise if the prison staff had utilized the outdoor mini-concrete exercise yards on Facility C.  (Allison Decl. ¶ 45.)

152.   SATF's Facility C is made up of eight identical buildings, or housing units (C1-C8.) (Id.)

153.   Facility C is divided into equal halves by a retaining wall.  (Id.)

154.   There are two large recreational yards that serve Facility C's inmate population during periods of normal programming.  (Id.)

155. The "lower yard" serves as the recreational area for inmates housed in Buildings C1-C4, while the "upper yard" provides recreational space for inmates housed in Buildings C5-C8.  (Id.)

156. Each yard contains a basketball court, a baseball diamond, a soccer field with goals, a sand volleyball court, a handball courts, a running track, four sets of chin-up and dip bars, tables with seats, drinking fountains, urinals, toilets, and sinks.  (Id.)

157. All eight of Facility C's housing units also have a small enclosed area, commonly referred to as a "concrete yard," that is roughly 2,400 square feet, or about the size of a basketball court.  (Id. at ¶ 46.)

158. These small yards have no recreation equipment and they can only accommodate 10-20 inmates at a time.  (Id.)

159. They were intended to be used for Security Housing Unit (SHU) inmates' outdoor exercise, in the event Facility C was ever converted to a SHU facility.  (Id.)

160. Facility C has never been converted to a SHU facility, however, so these yards have never been used for Facility C's general population inmates.  (Id.)

161. Also, in addition to the threat to prison security this posed, the scale of the investigation of the initial disturbance, and subsequence incidents, required the use of all available staff members to conduct investigation, provide security, assist in inmate medical escorts, assist in other inmate escorts, conduct inmate interviews, write reports, conduct mass cell searches, attend to inmate needs and ensure that the daily functions of the institution were met, and respond to any additional incidents that arose on Facility C and other Facilities.  (Allison Decl. ¶ 47; Hernandez Decl. ¶ 43; Goss Decl. ¶ 43.)

162. The running of a prison yard such as Facility C at SATF is an enormous and complex task.  (Allison Decl. ¶ 47; Hernandez Decl. ¶ 44; Goss Decl. ¶ 44.)

163. As such, SATF did not have enough staff to escort inmates to and from, and monitor inmates within, the outdoor mini-concrete exercise yards, keep the modified program in place, and provide for all of the Facilities' needs.  (Id.)

164.   Defendant Hernandez was appointed Associate Warden in March of 2010, at the very end of the modified program, and did not authorize any programming for Facility C because the modified program was already in place at that time.  (Hernandez Decl. ¶ 11.)

## C.   Defendants' Motion for Summary Judgment

Defendants Hernandez, Goss, and Perez move for summary judgment because they did not have authority to implement or alter a modified program.  In addition, Defendants argue that the outdoor exercise was reasonably restricted and the conditions under which Plaintiff was subjected were not cruel and unusual punishment, nor is there any evidence that any Defendant was deliberately indifferent to Plaintiff's health.  Furthermore, the modified program was imposed in response to serious violent incidents and was narrowly tailored to ensure institutional safety and security.  In the alternative, Defendants argue they are entitled to qualified immunity.

## D.   Plaintiff's Opposition

Plaintiff argues that although Defendant Hernandez, Goss, and Perez did not have the authority to implement a lockdown or modified program as alleged, they played a pivotal role in carrying out the way a modified program is run.  Plaintiff argues that Defendant Allison failed to carry out her obligation to allow segregation of Southern and Northern Hispanic inmates in "mini-concrete" yards, which resulted in a deprivation of his rights under the Eighth Amendment.  Plaintiff further argues that Defendants are not entitled to qualified immunity because their actions violated clearly established constitutional law.

## E.   Defendants' Reply/Filing of Surreply

In reply, Defendants argue that Plaintiff's declaration is not evidence as it was not dated and signed under penalty of perjury.  (Reply, at 2:7-12.)

On February 16, 2016, notwithstanding the fact that the Court denied Plaintiff's request for an extension of time to file a surreply, Plaintiff re-submitted his declaration, now dated and signed under penalty of perjury.  (ECF No. 81.)

In this instance, the Court will construe Plaintiff's notice as a request to file a surreply and grant such request in the interest of justice.  Accordingly, Defendants' objection to Plaintiff's

declaration originally filed on December 11, 2015, is overruled, and the Court will consider the re-filed declaration signed under penalty of perjury.

### F.    Findings on Defendants' Motion

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement." Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006).  "[W]hile conditions of confinement may be, and often are, restrictive and harsh, they 'must not involve the wanton and unnecessary infliction of pain.'"  Id. (quoting Rhodes v. Chapman, 452 U.S. 337, 347 (1981)).  "What is necessary to show sufficient harm for purposes of the Cruel and Unusual Punishment Clause depends upon the claim at issue. . . ."  Hudson v. McMillian, 503 U.S. 1, 8 (1992).  "[E]xtreme deprivations are required to make out a[n] [Eighth Amendment] conditions-of-confinement claim."  Hudson, 503 U.S. at 9 (citation omitted).  With respect to this type of claim, "[b]ecause routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation."  Id. (quotations and citations omitted).

Where a prisoner alleges injuries stemming from unsafe conditions of confinement, prison officials may be held liable only if they acted with "deliberate indifference to a substantial risk of serious harm."  Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).  The deliberate indifference standard involves an objective and a subjective prong.  First, the alleged deprivation must be, in objective terms, "sufficiently serious. . . ."  Farmer v. Brennan, 511 U.S. 825, 834 (1994) (citing Wilson v. Seiter, 501 U.S. 294, 298 (1991)).  Second, the prison official must "know[] of and disregard[] an excessive risk to inmate health or safety. . . ."  Farmer, 511 U.S. at 837.  Thus, a prison official may be held liable under the Eighth Amendment for denying humane conditions of confinement only if he knows that inmates face a substantial risk of harm and disregards that risk by failing to take reasonable measures to abate it.  Id. at 837-45.  Prison officials may avoid liability by presenting evidence that they lacked knowledge of the risk, or by presenting evidence of a reasonable, albeit unsuccessful, response to the risk.  Id. at 844-45.  Mere negligence on the part of the prison official is not sufficient to establish liability, but rather, the official's conduct must have been wanton.

1    Farmer, 511 U.S. at 835; Frost, 152 F.3d at 1128.

Prisoners have a constitutional right to outdoor exercise under the Eighth Amendment.  See Thomas v. Ponder, 611 F.3d 1144 (9th Cir. 2010) ("Exercise is one of the most basic human necessities protected by the Eighth Amendment."); LeMaire v. Maass, 12 F.3d 1444, 1457 (9th Cir. 1993).  Long-term denial of outdoor exercise can rise to the level of a constitutional violation.  See Spain v. Procunier, 600 F.2d 189 (9th Cir. 1979).  However, it is also true that "prison officials are authorized and indeed required to take appropriate measures to maintain prison order and discipline and protect staff and other prisoners…."  LeMaire, 12 F.3d at 1458.

    1.    Defendants Hernandez, Goss, and Perez

As previously stated, Plaintiff argues that despite Defendants Hernandez, Goss, and Perez's statements that they had no authority to implement the lock down, they are nonetheless liable for violating Plaintiff's Eighth Amendment rights because they played a "pivotal role in carrying out the way the modified program [was] ran."  (Opp'n at 17-18, ECF No. 75.)

Hernandez became the Associate Warden at the very end of the modified program, and well after it was implemented. (UF[3] 164.)  By virtue of the timing of the appointment, it is undisputed that Hernandez was therefore not involved in the development and implementation of the modified program.  (Id.)  Goss was the Facility Lieutenant, and Perez was a housing unit correctional officer.  These individuals were also not involved in the development or imposition of the modified program at issue.  (UF 18-25.)  Plaintiff fails to submit any evidence in support of his argument, and the undisputed evidence demonstrates that Defendants Hernandez, Goss, and Perez were not involved in the decision-making process to implement, continue, or discontinue any modified programs or lockdowns.  (UF 23, 24, 28.)  More specifically, it is undisputed that these Defendants did not have authority to order a modified program be imposed, they had no authority to deviate from the terms of the modified program, and they could not make any recommendations or decisions regarding the length of a modified program or lockdown.  (UF 18-25, 28, 29, 171.)  In addition, Defendants Goss

---

[3] "UF" refers to the Statement of Undisputed Facts in section B.

and Perez did not have authority to resolve inmate complaints regarding the parameters of the modified program.  (UF 28, 29.)

In response, Plaintiff argues that Defendants' argument is suspect because it was not provided as the reason in response to his inmate appeals.  (Opp'n at 19-20.)  Plaintiff's inmate appeals were denied because the safety and security of the institution required such modified program, and because of institutional staffing concerns during the modified program.  (Opp'n at 75-77.)  Contrary to Plaintiff's argument, Defendants have submitted evidence that the safety and security concerns required the modified program resulting in additional demands on prison resources, including available staff, during a modified program and the reasonableness of alternatives must be considered in this context.  (UF 155) (it was determined that Facility C did not have enough staff to monitor a group of inmates at concrete yard and still keep the current program in place."); (UF 166, 167) (the small concrete yards were never intended and have not been used by Facility C general population inmates.); (UF 168) (in addition to the threat to prison security this posed, the scale of investigation of the initial disturbance, and subsequent incidents, required the use of all available staff members to conduct investigations, provide security, assist in inmate medical escorts, assist in other inmate escorts, conduct inmate interviews, write reports, conduct mass cell searches, attend to inmate needs and ensure that the daily functions of the institution were met, and respond to any additional incidents that arose on Facility C and other Facilities.)

Because Defendants Hernandez, Goss, and Perez did not have any decision making as to the modified program at issue in this action, this factor, alone, entitles them to summary judgment as a matter of law.  See, e.g., Franklin v. Scribner, No. 07-0438-WVG, 2010 WL 3895113, *12 (S.D. Cal. Sept. 29, 2010) (court held that defendants Chief Deputy Warden and Facility Captains were not liable for prisoner's alleged constitutional deprivations because these prison official's "did not have the duties, responsibilities, or authority to institute the lockdown or modified program, nor the restrictions attendant therewith.")  Nonetheless, for the reasons explained below, even if Defendants Hernandez, Goss, and Perez had authority to modify the program, Plaintiff's claim fails on the merits as to all Defendants, including Warden Allison.

2. <u>Outdoor Exercise was Reasonably Restricted and Lack of Deliberate Indifference to Plaintiff's Health</u>

The deprivation of outdoor exercise is not a per se violation of the Eighth Amendment; whether it is a violation depends on the specific facts of the deprivation. Although Ninth Circuit law recognizes that some form of outdoor exercise is important to maintaining the physical and mental health of prisoners, <u>Spain</u>, 600 F.2d at 199-200, there is no bright-line rule establishing precisely how long a deprivation of outdoor exercise must be before it violates the Eighth Amendment, <u>Noble v. Adams</u>, 646 F.3d 1138, 1143 (9th Cir. 2011). Indeed, it is established law that outdoor exercise can be restricted and/or suspended under certain circumstances. <u>Spain</u>, 600 F.2d at 199-200; <u>Hoptowit v. Ray</u>, 682 F.2d 1237 (9th Cir. 1982). It is unquestionable that prison officials have a duty to prevent violence within the prison, and prison officials are accorded wide deference in determining the methods by which to maintain and/or restore order. <u>See</u> <u>Farmer v. Brennan</u>, 511 U.S. at 833; <u>Hayward v. Procunier</u>, 629 F.2d 559, 603 (9th Cir. 1980).

In this instance, it is undisputed that on June 21, 2009, a group disturbance between the Southern and Northern Hispanics inmates occurred in Facility C at SATF. (UF 3.) The incident took place simultaneously on yards 1 and 2 and housing units C4, C6, and C8 of Facility C. The incident involved seventy-five inmates, and eleven Northern Hispanic inmates were treated at outside hospitals for the injuries from the incident. (UF 43, 44.) Facility C housed over 650 inmates during the time in question, and a majority of the inmates have a history of violent and assaultive behavior. (UF 5, 6.) It is well known within the CDCR that Southern and Northern Hispanic inmates harbor tremendous enmity for each other. (UF 35.) Immediately following the incident, the entire population of Facility C was placed on lockdown. (UF 45.) On June 30, 2009, another violent incident occurred on Facility C when a Southern Hispanic inmate assaulted a Black inmate during an escort to the medical clinic on the upper yard of Facility C. (UF 47.) On August 18, 2009, a Northern Hispanic inmate attacked two Southern Hispanic inmates in the Facility C medical clinic holding cell. (UF 64.) Three other Southern Hispanic inmates in the holding cell began to assault the Northern Hispanic inmate. (UF 65.) On September 2, 2009, staff discovered metal missing from the light fixtures in cells of Housing Unit C8. (UF 76.) Based on experience and training, it was reasonably concluded by prison officials that

the metal was removed from the light fixture by the inmates in order to fabricate an inmate manufactured weapon for a planned future assault.  (UF 77.)  On October 16, 2009, two restrained Northern Hispanic inmates were attacked by two unrestrained Southern Hispanic inmates in Housing Unit C1's dayroom.  (UF 96.)   On October 26, 2009, staff discovered metal stock missing from Housing Unit C2.  (UF 98.)  Based on experience and training, prison officials again reasonably concluded that the metal was removed by the inmates in order to fabricate inmate manufactured weapons for planned future attacks.  (UF 99.)  On November 4, 2009, nine restrained Southern Hispanic inmates assaulted two restrained Northern Hispanic inmates in Housing Unit C8's dayroom while staff were conducting housing unit searches.  (UF 100.)  During the week of November 6, 2009, Facility C staff discovered an inmate manufactured weapon (metal sharpened to a point) secreted in the rectum of a Southern Hispanic inmate.  (UF 102.)  During the week of December 6, 2009, there were two separate in-cell assaults between Southern Hispanic inmates involving inmate-manufactured weapons, and there was one incident on the recreation yard involving two Black inmates and a razor. (UF 109.)  On February 2, 2010, a Black inmate committed the act of attempted murder on a peace officer on Facility C.  (UF 110.)

After serious violent incidents or serious threats to prison safety, access to the recreational yard is typically restricted.  (UF 132.)  This assists in preventing further incidents of violence at the facility, and makes it more difficult for inmates to communicate and coordinate attacks both inside and outside the institution.  (UF 133.)  As a result of the above incidents, the modified program in question was implemented in response to the serious and persistent violence among the inmates.  The repeated incidents required the continuance of the modified program to ensure the safety and security of the inmates, the staff, and the prison.  Thus, it is undisputed that Plaintiff's right to outdoor exercise was temporarily suspended not because of any disregard for a substantial risk of serious harm by the Defendants, but because of ongoing violence and threatened violence at the prison.  The numerous outbreaks of violence, including staff assaults, inmate assaults, mass disturbances, the discovery of inmate-manufactured weapons, and the discovery of missing metal, led to the modified program, and its continuance, from June 22, 2009 to April 22, 2010.  Moreover, there is no evidence that Plaintiff was somehow singled out or treated any differently than that of the other Hispanic inmates who were

1   subject to the modified program.  Consequently, there is no evidence that suggests Defendants were

2   seeking to inflict unnecessary and wanton pain on the Plaintiff by denying him outdoor exercise, or

3   that they did so "maliciously and sadistically for the very purpose of causing harm."  LaMaire, 12 F.3d

4   at 1452.

5       The warden and the administration met at regular intervals to assess the need for the modified

6   program to continue and determined that it was unsafe to return the Hispanic inmate population to

7   regular programing.  (UF 18-21, 25-27, 49, 53-56, 60-61, 68-69, 72-73, 78, 80-81, 83-84, 87-89, 92-

8   93, 101, 103, 117, 119.)  Defendant Warden Allison and her administration made numerous attempts

9   to reduce the scope of the modified program based on the involved inmates.  Indeed, inmates who

10  were not involved in the continued violence were gradually returned to normal programming as the

11  circumstances allowed.  (UF 19-20, 49-50, 53-63, 68-75, 78-95, 101, 103-108, 117-122.)

12  Accordingly, the continuous, ongoing, and apparently pre-planned incidents required that the modified

13  program continue until the prison staff could definitively determine that it would be safe to lift the

14  constraints of the modified program.  See, e.g., Anderson v. Marin, No. 1:09-cv-01547-LJO-GBC

15  (PC), 2012 WL 6697781, at *8 (E.D. Cal. Dec. 21, 2012) ("Among all of the programming activities

16  that are suspended during a modified program, it is most difficult to determine when exercise

17  programs can be safely resumed.").  Without assessing the risk, determining what areas of the prison

18  could be affected, and conducting an investigation, Facility C staff could not accurately identify which

19  Facility C inmates were likely to be involved in the violent incidents and threats of violence.

20      In his opposition, Plaintiff argues that Defendant Allison submitted an inmate appeal

21  addressing his claim that he was being denied outdoor exercise.  Irrespective of whether Defendant

22  Allison had actual knowledge of Plaintiff's inmate appeal challenging the denial of outdoor exercise

23  based on the modified program, Plaintiff's appeal never mentioned how the modified program affected

24  him and he merely challenged the denial of outdoor exercise based on the modified program.  (Opp'n

25  72-79)

26      In any event, as articulated above, based upon the investigation and the prison administrators'

27  bona fide security concerns, it was determined that if the involved groups had returned to normal

28  program prematurely and confronted one another, more violence and further threat to the security and

safety of the inmates and staff likely would have occurred.  Even if one believes that a ten month period of time appears lengthy on its face, in this instance the violence was ongoing and reoccurring after the initial incident on June 21, 2009, and after further incidents and resulting investigation, there is sufficient evidence in the record to support and defer to the prison's determinations.  See, e.g., Norwood v. Vance, 591 F.3d 1062, 1069 (9th Cir. 2009) (when a prison lockdown is in response to a genuine emergency, this court "may not lightly second-guess officials' expert judgments about when exercise and other programs [can] … safely be restored.")  Plaintiff has failed to present any admissible evidence to rebut Defendants' evidence that it was not safe to return Plaintiff to normal programming until April 2010, Plaintiff has failed to raise a triable issue of material fact, and Defendants are entitled to summary judgment.[4]

## IV.

## RECOMMENDATIONS

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.      Defendants' motion for summary judgment be GRANTED; and

2.      The Clerk of Court be directed to enter judgment.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, Plaintiff may file written objections with the Court.   The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Plaintiff is advised that failure to file objections within the specified time may

//

//

//

---

[4]  Because the Court has determined in its review of Plaintiff's claim on the merits that no constitutional right has been violated based on the allegations and facts established on the record, there is no reason to further analyze or address the issue of qualified immunity.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

result in the waiver of rights on appeal.  <u>Wilkerson v. Wheeler</u>, 772 F.3d 834, 838-39 (9th Cir. 2014) (citing <u>Baxter v. Sullivan</u>, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **July 22, 2016**

UNITED STATES MAGISTRATE JUDGE